IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

PAUL ALLEN BROWN                              §

                                              §          CIVIL ACTION NO. 9:06cv96

STACY KIMBERLIN, ET AL.                       §

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Paul Allen Brown, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights.   The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c).   As Defendants, Brown named Stacy Kimberlin, a patient liaison at the Lewis Unit of TDCJ-CID; Anthony Freeman, a psychotherapist at the Lewis Unit; Dennis Hendricks, a mental health liaison at the Lewis Unit; Frank Crippen, a psychotherapist at the Lewis Unit; George Fong, a physician's assistant at the Lewis Unit; and Richard Seward, a psychiatrist at the Lewis Unit.

The lawsuit was initially filed in the Southern District of Texas.   The claims concerning personnel at the Lewis Unit, which arose in the Lufkin Division of the Eastern District of Texas, were severed from the original lawsuit and transferred to this District and Division.

An evidentiary hearing was conducted on February 13, 2007, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).   At this hearing and in his complaint, Brown said that prior to arriving in TDCJ, he had been treated for mental illness in the free world.   In March of 2003, he was transferred to the Lewis Unit, where the claims in the present lawsuit occurred.

Brown states that on May 8, 2003, he saw Kimberlin and told her that he did not want to leave his cell and had not gone to work in three days; he stated that he did not feel like he was able to do anything, including leaving his cell to take his medication.   He said that he was having

1

problems being released from his work assignment to get his medication, Risperdal, and asked that the time of dispensing of the medication be changed. Kimberlin denied this request and said that a psychiatrist was not available to see him at that time; instead, the best she could do was give him "a bitch session" at which he could voice his complaints.

In June of 2003, Brown said, he was seen by Dr. Seward, who also denied his request that the time of dispensing of the medication be changed. He said that Dr. Seward would not answer his questions and told him that there was no such thing as "voices in the head;" when Brown stopped answering Dr. Seward's questions, the doctor had him leave the office, and later discontinued the Risperdal. Dr. Seward then falsely documented that a test called the M-Fast had been done, which showed that Brown was a "feigned patient."[1]

As a result, Brown says, he became uncomfortable in speaking with anyone else about his condition, which deteriorated because of the discontinuance of his medication. On June 24, 2003, he came to the waiting unit of the infirmary for an appointment with Freeman. However, Brown says, Freeman allowed an automatically locking door to close when he called him for his appointment; Brown speculates that this was done in order to deny him mental health care. Freeman did not see him, despite the fact that an officer requested that Brown be seen.

A couple of days later, on June 26, Freeman did see Brown in the mental health office. At this time, Freeman proposed to administer a test called the MMPI-2, which Brown says is a widely-used test to identify configurations of personality traits in normal persons and to study the personality patterns occurring in various types of mental illness. The test contained over 500 true-false questions.

Although Brown asked to be allowed to take the test in private, he says, Freeman would not let him, and told him to take it in the waiting room. There, he was teased as being a mental health

---

[1] The M-Fast, or Miller Forensic Assessment of Symptoms Test, was developed to detect malingering in psychiatric or pseudo-psychiatric patients. *See* R.J. Beaber *et al.*, <u>A Brief Test for Measuring Malingering in Schizophrenic Individuals</u>, American Journal of Psychiatry, December 1985.

patient, and his answers were read aloud by other inmates in the waiting room.  He became uncomfortable and began answering questions in such a way as to make the other inmates believe that he was not taking the test seriously.  He says that this caused the other inmates "to laugh with him and not at him," but rendered the test results invalid.  Despite this, Brown says that the test results "influenced future treatment decisions."

On August 13, 2003, Brown says, he was seen by Kimberlin in the mental health office.  He told her that he had been feeling "dizzy" in his thinking and that he felt like things were "not real." He said that he was hearing a voice in his head telling him to climb the perimeter fence and escape. Kimberlin told him that there is no such thing as a voice in the head and that she did not want him on medication because it would "slow him down."  He believes that Kimberlin represented him in the mental health records as not needing medical care, even though he did.  She refused to request his free-world medical records and told him that he would be seen by a psychiatrist "soon."  He says that he believes that Kimberlin conspired with Freeman to deny him mental health care.

Almost two weeks later, on August 25, Brown was again seen by Kimberlin, and told her that he felt "dizzy" mentally and that he was hearing voices in his head.  He did not believe that his surroundings were real and he had problems with sleep and impulse control.  Kimberlin referred him to Freeman, who saw him for about five minutes.  Freeman gave him handouts on exercise, relaxation, and sleep, and told him that his problems would be resolved by the handouts.

On October 8, 2003, Brown says that he was seen by Freeman, who again wished to administer the MMPI-2, but again insisted on placing Brown in the waiting room to take the test. Brown indicates that the same sequence of events took place as on the previous occasion.  As a result, Brown says, he was diagnosed as "manipulative by anti-social personality disorder."  He says that a diagnosis of anti-social personality disorder "literally blackballs a patient as being a fictitious person."

On January 13, 2004, Brown says, he was seen by Freeman.  However, Freeman "ignored, belittled, and manipulated" Brown's complaints of sleep problems, impulsive behavior, and

paranoia.  He says that Freeman told him that Brown's work supervisor would be called to ask that Brown be moved to a work location with less contact with other people, on account of his paranoia, but this was never done; Freeman indicated that Brown did not need to be seen by the mental health staff any more.

However, Brown says, he was seen by Freeman two days later.  He says that Freeman offered to have him transferred to another unit, but that he, Brown, believed this to be "manipulation" and so declined the offer.  Instead, Brown said he needed mental help, but Freeman told him that he did not need such help.  Freeman also admitted that he had not called Brown's work supervisor.

Following this, on March 8, 2004, Brown was seen by Kimberlin, who also "ignored, belittled, and manipulated" his complaints of paranoia.  He says that Kimberlin told him that he was "not crazy," that he had no mental issues, and that he had "a security concern, not a mental health concern."

Three weeks later, on March 29, 2004, Brown saw Freeman, and told him that he thought that an officer was out to get him, but Freeman said that it was normal for inmates to feel that way.  He would not allow Brown to see a psychiatrist or a mid-level provider.

Brown says that in an effort to stop the paranoia, he avoided going to work and secluded himself in his cell.  As a result, he was subjected to disciplinary charges along with a demotion in classification status from general population to medium custody.  This caused him to be around inmates who were "more problematic," and being confined to a cell for approximately 20 hours per day with another inmate exaggerated his condition.

On April 20, 2004, Brown saw Kimberlin.  At this time, he told her that he was not having problems with any other inmates.  Despite this, Kimberlin contacted the unit extortion officer, John England, and England and Kimberlin asked Brown about other inmates harassing him, but Brown said that this was not happening.  Nonetheless, Brown asked to be placed in segregation, and England said that he had to have a reason to put Brown in segregation.  Brown threatened to harm his cellmate, although he did not actually intend to do so, in order to be placed in segregation to

escape his paranoia.  He was placed in segregation pending a hearing. Brown says that the defendants' view that he was having security problems influenced the treatment decisions made.

On April 21, 2004, Brown reported a sexual assault to England, in what he described as a "desperate attempt" to be segregated for his mental health.  On April 24, he was seen by Kimberlin, who asked if he wanted someone to talk to, or therapy, and Brown said that he wanted therapy. Kimberlin said that she would conduct the therapy.  Brown states that he was "crying and asking for help," but he did not receive any therapy or mental health treatment.

Brown also says that on April 21, he saw Freeman, but said that he did not want to talk to him.  Freeman walked away.  Brown cut the word "HELP" into his arm with a razor blade and tried to hang himself.  Between April 26 and 30, Brown did not eat anything.  He says that nothing was done, but acknowledges that on April 30, he was transferred to the Skyview Unit, a psychiatric facility, although he was later sent back to the Lewis Unit.

On June 15, 2004, Brown says that he saw Freeman and asked to be removed from the mental health case load so that he could commit suicide without detection.  Freeman responded that Brown was not and never would be on the mental health case load.  Brown again ceased eating for four days and was sent to the Skyview Unit, but was soon returned to the Lewis Unit.

On June 28, 2004, Brown says that he was seen by Crippen, who "ignored, belittled, and manipulated" his complaints.  He says that Crippen manipulatively offered to place him in a single cell or safekeeping, when Crippen lacked authority to do so.  Crippen acted as though he were calling the Skyview Unit and arranging for inpatient care, but did not actually place the call.  When Brown realized this, he became angry, but Crippen just laughed.

Brown states that Sgt. John Odom witnessed his treatment at the hands of prison officials. Odom offered to confirm Brown as a gang member so that he would be placed in segregation, and to give him a disciplinary case so that Brown would be moved to another unit, where he could receive treatment.  On June 30, Freeman overheard a conversation between Brown and a counsel substitute named Jane Ivins in which Brown said that he wanted to be placed permanently in

5

segregation.  Ivins said that if a person claimed gang membership, that person would be segregated, and Brown said that he was a "gangbanger," even though this was not true.

On July 2, 2004, Brown says that he saw Freeman, who said that he was not worried about Brown not eating because "he would have to eat some time."  Freeman and Kimberlin did not intervene or treat Brown's lack of eating for several days.  On July 16, Kimberlin saw Brown after a security officer said that Brown was suicidal, but Kimberlin would not let him see a psychiatrist. Instead, Kimberlin said that there was nothing wrong with him and dismissed him.

In response, Brown says, he overdosed on acetaminophen (Tylenol).  This was witnessed by a guard, who called medical staff.  He was taken to the clinic, but Freeman told the medical staff that he had telephoned the witnessing officer, who said that Brown did not overdose.  Brown says that Freeman did not call anyone but just said that he did.  While medical staff was treating Brown, Freeman told him that it "sounds like someone needs their tummy pumped."  Freeman continued to harass him by trying to talk to him even though Brown did not want to talk to Freeman.

A doctor at the unit named Thomas told guards that Brown was suffering from bi-polar disorder, and ordered that he be sent to the Tyler County Hospital for the acetaminophen overdose. Freeman and Kimberlin tried to get Dr. Thomas to manipulate Brown, but the doctor refused, saying that Brown "needed serious help."  He was sent to the Skyview Unit, but was later returned to the Lewis Unit.

On July 31, Brown was seen by a nurse named Candace Hughes in the Lewis Unit infirmary. He told Nurse Hughes that he intended to save up a quantity of medication so as to end his life.  The nurse "contracted him to safety" until the next morning, when there was more time to talk to him.

The next day, Brown says, he was seen by Nurse Hughes again.  He says that she told him that he was in need of treatment and due to her experiences with Freeman and Kimberlin, she knew that he was not going to get any care.  According to Brown, Hughes said that Freeman and Kimberlin intentionally have medications discontinued, and got him a prescription for valproic acid.  She told Brown that Freeman and Kimberlin would try to have the medication discontinued, despite any

benefit that he was getting, and suggested that he write to the unit psychiatrist; she said that she would try to make sure that his letter was not intercepted by Freeman or Kimberlin.

Brown says that the valproic acid brought him improvements, and he wrote a three-page letter and gave it to her.  He says that he believes that Freeman and Kimberlin tried to manipulate others to believe that Brown had not improved when he had, but gives no indication of why he believes this.

On August 10, 2004, Brown says, he saw George Fong, a physician's assistant, and a psychiatrist from the Estelle Unit named Marciano Limsiaco.  Fong said that he did not plan on reading the three-page letter, and Fong and Limsiaco said that Brown had hepatitis, based on a year-old liver test.  Brown replied that he had never had hepatitis and had recently tested negative for it.  However, they discontinued the valproic acid despite his pleas and protests.

The next day, he saw a classification officer, who said that she had talked to Kimberlin about Brown and that the conversation was "one-sided."  Brown talked to Kimberlin that day about obtaining his medical records but got nowhere.

During September of 2004, Brown says that he submitted over 200 requests for medical care.  He submitted about 150 requests on one day, September 10.  Freeman came to his cell and told him that he did not care how many sick call requests Brown filed, he (Brown) would not get medication.  Freeman took about a hundred of the requests and pushed them under Brown's cell door, and walked away.  Brown later received an answer, signed by Freeman, to one of his requests, saying that "#150 requests are not enough, these issues have been addressed previously."

On September 14, Brown says that he was seen by Freeman in the waiting room, where there were numerous other inmates present; Freeman refused the request for privacy and said that Brown would be seen there or not at all.  Brown says that "upon information and belief," Freeman claims that the mental health manager, Tom Downer, said that Brown should be seen in the waiting room "for security reasons."  Brown said that this is a violation of his privacy rights, and wrote a complaint to Downer that day.

7

Two days later, Brown says that he was again seen by Freeman in the waiting room. Freeman said "you finally got someone on your side," trying to manipulate him into thinking that his complaint had produced resolution. Freeman asked if Brown was suicidal, and Brown said that he did not want to go back to Skyview, so he would say no; in fact, he was suicidal, having collected some 200 medication tablets. Freeman said that "these questions are for someone who is suicidal" and sent him back to his cell.

On September 18, Brown says that he was seen by Crippen and Hendricks. Crippen asked him what he wanted; Brown says that he believes that this question is asked as a trap, but he replied that valproic acid had helped him and he wanted it back. Crippen said that "he was the boss" and that he would try to get the medication back; however, Brown says that he believes that this was manipulative, because Crippen's record entries indicate intent for denial of treatment. Crippen then handed Brown his complaint about the denial of privacy, and said "this is what I call busy work." He then told Brown to leave.

On September 20, Brown was seen by Fong and Limsiaco, but they ignored his complaints. They told him that if his hallucinations he had were telling him anything that was a security risk, then security would take action against him. He says that he withheld information concerning his health care for fear of disclosure of his condition by the defendants. Limsiaco asked if he were suicidal, and when Brown said yes, Limsiaco said that people who are really suicidal do not tell anyone. Fong accused him of being a gang member, which he denied. Brown began to cry, and had to be removed from the room. The next day, he took some 300 tablets of acetaminophen, 50 ibuprofen tablets, and 20 decongestants, but began vomiting and had to present himself to medical staff. He was sent to the Tyler County Hospital in Woodville and was later to sent to the hospital in Galveston, where he received psychiatric medications. From there, Brown says, he was sent to the Estelle Unit, and not returned to the Lewis Unit.

### Brown's Medical Records

The Court has received and reviewed copies of Brown's medical records, which are extensive to say the least.  Because of the extraordinary length of these records, over 1000 pages in length, the Court will not undertake a detailed discussion.

It is obvious from a review of the records that Brown was seen and examined by medical personnel on many occasions.  The crux of Brown's disagreement with his medical care at the Lewis Unit is that while he was there, he was diagnosed as having no Axis I disorder.

The standard diagnostic system for mental illness is found in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, commonly called the DSM-IV.  Under this system, there are five axes, which are:

Axis I - Clinical Disorders.  This category includes disorders normally diagnosed in infancy, such as autism; delirium, dementia, or other cognitive disorders, such as Alzheimer's syndrome; mental disorders due to a general medical condition; substance abuse-related disorders, schizophrenia and other psychotic disorders; mood disorders such as depression or bi-polar disorder; anxiety disorder; somatoform disorders such conversion disorder or hypochondriasis; factitious disorders; dissociative disorders; sexual and gender identity disorders; eating disorders; sleep disorders, impulse control disorders, and adjustment disorders.

Axis II - Personality Disorders and mental retardation.  This category includes paranoid personality disorder, borderline personality disorder, antisocial personality disorder, and dependent personality disorder.

Axis III - General Medical Condition.  This category includes general physical concerns which may have a bearing on understanding or managing the patient's mental disorder.

Axis IV - Psychosocial and environmental problems.  This category includes problems with the primary support group, such as divorce or abuse; problems related to the social environment, such as retirement or living alone without friends; educational problems such as illiteracy;

occupational problems, housing problems, economic problems, access to health care concerns, or problems with interactions with the legal system,

Axis V - Global Assessment of Functioning.  This is a number from 1 to 100 representing the caregiver's judgment of the person's level of functioning.  The scale ranges from 100, no symptoms, to 70, mild symptoms, to 50, serious symptoms or impairment, to 30, behavior considerably influenced by delusions, to 10, a persistent danger of severely injuring self or others. *See* http://www.mental-health-matters.com/articles/article.php?artID=1 (general overview of the axis diagnostic method); http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_I.jsp (detailed discussion of Axis I disorders).

In Brown's particular case, this means that the psychiatric staff at the Lewis Unit determined that he did not have an Axis I diagnosis, meaning that he did not suffer from a significant mental disorder.  Notes in the medical records indicate that the staff believed that Brown's behavior was manipulative and that he was simply seeking medications.  The medical records indicate that Brown was sent on several occasions to the Skyview Unit, and the medical staff there also believed that Brown did not suffer from a significant mental illness.

In fact, records from Skyview during the time period covered in Brown's complaint indicate that at least some of the medical staff there thought that Brown was feigning mental illness.  He is quoted as making statements such as "I told you, I'm Brown and I have my ways.  I can get anything I want," and nurses' observations state several times that he is acting in a manipulative manner. These records show that Brown was sent to Skyview several times for observation and  evaluation during the time period covered in the lawsuit.

In a grievance regarding Freeman and Kimberlin, dated July 8, 2004, Brown admits that he lied to Kimberlin and Freeman, and that he lied at an evaluation at the Skyview Unit.  He says that he really needs help but that because he lied, he is listed as seeking secondary gain.  The response to this grievance is that he has been seen several times by mental health staff since his return from Skyview crisis management.

In his Step Two appeal, Brown indicates that he was the victim of an assault (apparently sexual in nature) about a year and a half earlier, and that he lied in order to try to hide it from everyone, including himself.  He acknowledges that he has been told that he has no Axis I diagnosis but says that he needs help and therapy.  The response is that he was advised appropriately at Step I and that he is receiving care and evaluations.

### Legal Standards and Analysis

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989).  However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim.  Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991).  Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action.  Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993).  The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs.  Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs.  Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985).  It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

The case of Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), contains certain significant similarities to the present one.  In that case, the defendant Dr. Reddy was a psychiatrist at the Coffield Unit and had treated inmate Antoine Domino a number of times.  On August 2, 1996, Domino asked to meet with a member of the psychiatric team, and met with a psychologist named Gail Haynes, who referred him to Dr. Reddy for further evaluation.  In his meeting with Dr. Reddy, which lasted approximately five minutes, Domino asked for sleeping pills and expressed apprehension about an upcoming transfer from administrative segregation to the general population. When Dr. Reddy denied the request for sleeping pills, Domino said "I can be suicidal."  Dr. Reddy did not believe that Domino was a suicide risk, but that he was attempting to achieve secondary gain. Domino began banging his head on the table and Dr. Reddy had him taken back to his cell.  Two and a half hours later, Domino committed suicide.

Prior to this, Domino had a long history of psychological problems, dating back before his incarceration.  Dr. Reddy had diagnosed him as suffering from major depression and gave him a medication called Prozac, an anti-depressant, as well as an order for weekly visits with a therapist.

In March of 1995, Domino was sent to Skyview for six days after making suicide threats. Medical personnel at Skyview diagnosed him as suffering from bi-polar disorder, but noted that some of his behavior could be characterized as manipulative.  When he returned to Coffield, Dr. Reddy prescribed lithium to treat the bi-polar disorder.

However, in August of 1995, Dr. Reddy discontinued the lithium and Prozac because Domino was non-compliant in taking them and because Domino refused to permit blood work to monitor the lithium.  Domino did not attend scheduled counseling sessions in September or October of 1995.  In December, he was released from the psychiatric caseload because he was no longer expressing psychotic symptoms and would be seen only on request.

Domino was not seen again until June of 1996, when he asked to see a psychiatrist.  A member of the psych team met with him and wrote that suicidal ideation was present but no plan was

evident.  Domino scheduled another meeting with the therapist in July 1996 but did not attend.  His

next meeting with a member of the psychiatric team was with Gail Haynes on the day of his suicide.

      The administrator of Domino's estate brought suit.  The district court denied the defendants'

motion for summary judgment, but the Fifth Circuit reversed.  In so doing, the Fifth Circuit stated

as follows:

> Deliberate indifference is an extremely high standard to meet.  It is indisputable that
> an incorrect diagnosis by prison medical personnel does not suffice to state a claim
> for deliberate indifference.  Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985).
> Rather, the plaintiff must show that the officials "refused to treat him, ignored his
> complaints, intentionally treated him incorrectly, or engaged in any similar conduct
> that would clearly evince a wanton disregard for any serious medical needs."  Id.
> Furthermore, the decision whether to provide additional medical treatment "is a
> classic example of a matter for medical judgment."  Estelle v. Gamble, 429 U.S. 97,
> 107 (1972).  And, "the failure to alleviate a significant risk that [the official] should
> have perceived, but did not," is insufficient to show deliberate indifference.  Farmer
> v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.  The Fifth Circuit explained that the record reflected the "critical fact" that

Domino was not being ignored by Dr. Reddy and the rest of the psychiatric staff, and said that the

evidence did not support an inference that Domino was so obviously suicidal that Dr. Reddy must

have known of yet disregarded the risk.  The Court concluded by saying that while Dr. Reddy's

diagnosis - that Domino was not suicidal - was wrong, an incorrect diagnosis does not amount to

deliberate indifference.  Domino, 239 F.3d at 756.

      In the present case, it is clear that Brown was not being ignored by the medical staff.  On the

contrary, he was seen on a great many occasions.  Nothing in the record supports an inference that

the Lewis Unit staff, including the six defendants named in this lawsuit, refused to treat him, ignored

his complaints, or otherwise showed a wanton disregard for serious medical needs.  As noted above,

the central issue in the case is the fact that while he was at the Lewis Unit, Brown did not have an

Axis I diagnosis, and so the staff believed  that, since he was not mentally ill, he was acting for

secondary gain.  Brown himself conceded in his grievance that he had lied to Freeman and Kimberlin

over an extended period of time, and while he may have had reasons for doing so which seemed

valid at the time, it seems clear that repeated lies to mental health personnel will simply convince

those personnel that the patient is not being sincere, but is acting for secondary gain.  While some of the actions taken by the defendants described by Brown in his complaint (particularly some of the actions of Freeman and Kimberlin) may well have been inappropriate, or even negligent, Brown simply has not shown that he suffered deliberate indifference to his serious medical needs.  As explained by the Court in <u>Domino</u>, even if the determination that he had no Axis I disorders while at the Lewis Unit was in error, an incorrect diagnosis is not proof of deliberate indifference.  *See also* <u>Stewart v. Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999).

The medical records show that Brown's prescription for valproic acid was discontinued when tests showed elevated liver enzymes.  The National Institute for Health reports that valproic acid can cause serious or life-threatening damage to the liver.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682412.html.  There is nothing deliberately indifferent about discontinuing a medication which could cause liver damage in the face of test results showing liver problems.

In short, Brown's complaint is in essence that he disagreed with the diagnosis which he received from the medical staff at the Lewis Unit, and that he disagreed with the treatment which he received as a result of this diagnosis.  Neither of these contentions is sufficient to show that Brown suffered from deliberate indifference to his serious medical needs.  *See* <u>Norton v. Dimazana</u>, 122 F.3d at 291; <u>Domino</u>, 239 F.3d at 756.  Nor has Brown shown that the Defendants were deliberately indifferent to his serious medical needs in any other regard.  His claims are without merit.

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory.  <u>Neitzke</u>

14

v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Brown's claims lack any arguable basis in law and fail to state a claim upon which relief may be granted in federal court.  Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b).  *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous as to its refiling in federal court.  28 U.S.C. §1915A(b).  The Court offers no opinion as to the merits *vel non* of any claims for state-law negligence which Brown may bring in the courts of the State of Texas, and the dismissal of this federal lawsuit is without prejudice to any such state-law claims, brought in state court, which Brown may wish to raise.  It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **24** day of **April, 2007.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

15